## UTAH SAVING & TRUST CO. v. BAMBERGER.

### No. 1599 (81 Pac. 887).

1. APPEAL—REVIEW OF FACTS—CONCLUSIVENESS OF FINDINGS.—Under Constitution, article 8, section 9, providing that appeals in cases at law shall be on questions of law alone, findings of the trial court in an action at law supported by substantial evidence, cannot be disturbed on appeal.

2. CONTRACTS—CONSIDERATION—PERFORMANCE OF LEGAL DUTY.—An agreement by plaintiff's intestate to cancel a note executed by defendant provided defendant would pay or cause to be paid a cer-

tain note and condemnation bonds on which he and plaintiff's intestate were liable, was without consideration 'here; prior to the making of such agreement, defendant was aɪ ɔinted receiver for the corporation on account of which the notes nd bonds were excxuted, and had paid the note and bonds frᴄ the corporation's assets under order of court.

3. SAME.—Nor did the fact that defendant was the promoter of and had supplied the capital for the corporation which purchased the assets of the insolvent corporation at receiver's sale furnish a consideration for the agreement, as such services on his part were also rendered prior to the making of such agreement.

BARTCH, C. J., dissenting.

(Decided July 11, 1905.)

APPEAL from District Court, Salt Lake County; T. D. Lewis, Judge.

Action by the Utah Savings & Trust Company, administrator of the estate of James F. Woodman, deceased, against Simon Bamberger. From a judgment for defendant, plaintiff appeals.

REVERSED.

*C. S. Zane* and *J. W. Stringfellow* for appellant.

*Henderson, Peirce, Critchlow & Barrette* for respondent.

APPELLANT'S POINTS.

We insist that the court erred in its ruling permitting the defendant to file its amended answer with the new defense, first because the oral agreement relied upon as a defense was made October 1, 1896, and from that time must have been known to the defendant—about eight years before; leave to file the amended answer was given on February 24, 1904, and the leave was given nearly fifteen months after the suit was commenced, and more than nine months after the court had sustained plaintiff's demurrer to the second defense set up in the original answer and about eleven months

after the first answer was filed, and said amended answer was inconsistent with the original answer and the agreement so alleged as a defense was verbal. In the first answer defendant's signature was denied under oath, and the defense stated in said fifth, sixth, seventh, and eigth paragraphs of the amended answer was not sufficient in law and no excuse was offered for the delay. "Leave to file an amended answer setting up a new defense or a new fact known to the defendant before or at the time the original answer was filed will not be given." (*Cross v. Morgan,* 6 Fed. Rep. 241; *Smith v. Babcock,* 3 Sumn. [U. S.] 583; *March v. Mitchell,* 26 N. J. Eq. 500. *Fonthy v. Par,* 35 W. Va. 70; *Graham v. Skinner,* 4 *Jones* [N. Car.] 94; *India Rubber Coml. Co. v. Phelps,* 8 Blatchf. 85.)

The court erred in overruling plaintiff's demurrer to defendant's answer on the ground that the defenses it set up were inconsistent. (R. S. 1898, sec. 2972 and notes; *Burnham et al. v. Call et al.,* 2 Utah 437; *Blodgett v. McMurtry,* 57 N. W. 985; 1 Ency. Plead. and Prac., p. 856.) The last authority states the rule: "Two prominent elements intended in the code system of pleading are that falsehoods should not be put upon the record and that the pleadings should disclose the facts relied on in support of or defense against the action. Therefore the rule is general outside of the states enumerated in the note to the preceding paragraph, that inconsistent defenses cannot be set up." Utah is not one of those states in which inconsistent defenses can be set up.

The alleged agreement averred in the defense last aforesaid being a simple contract, it was necessary to allege a consideration for plaintiff's promise and none having been alleged, a defense was not shown and therefore the court erred in overruling plaintiff's demurrer thereto. (*Felt v. Judd,* 3 Utah 414, 4 Ency. Plead. and Prac., p. 928.)

When the consideration of a promise is the promisee's engagement to pay money or to do some other act for the benefit of the promissor his non-performance of the act constitutes a failure of consideration. (*Pope v. Hays,* 19 Tex.

379; *George Dickson v. Richardson,* 14 Pick. [Mass.], 217 and 218; *Candiff v. McLean,* 8 S. W. 43; *Booth v. Fitzer,* 82 Ind. 66; *Powee v. Subers,* 67 Ga. 448; *Tooms v. West,* 94 Ga. 280; *Mary Washington & Co. v. McIntosh,* 37 Miss. 671; *Mooker v. Lewis,* 40 Ind. 1; *Head v. Baldwin,* 83 Ala. 132; Hammond on Contracts, pp. 701 and 703; *Parmell v. Thompson,* 45 N. Y. 58.)

"When any limitation or period of time prescribed by an existing statute for acquiring a right or barring a remedy or any other purpose has begun to run before the Revised Statutes goes into effect and the same or any limitation is prescribed in the Revised Statutes, the time which has already run shall be deemed a part of the time prescribed as such limitation by the Revised Statutes." But the statute of 1888 which had run seven months and ten days before the law of 1897 took effect had been repealed by the latter act seven months and twenty days before the law of 1898 took effect, and was not an existing law at the time it was enacted, and the time that the law of 1888 had run cannot be deducted from the six years under the law of 1897. Therefore the court erred in overruling the demurrer to the defense of the statute of limitations set up in defendant's answer. *Packscher v. Fuller,* 6 Wash. 537, 33 Pac. 875; *Shon v. Waterson,* 17 Wall. [U. S.] 596; *Hubber v. Zimerman,* 8 Okla. 574, 58 Pac. 738; 1 Wood on Limitations, p. 43; *Billings v. Hall,* 7 Cal. 1; *Nelson v. Nelson,* 6 Cal. 430.) The demurrer to defendant's amended answer being overruled the exception thereto was not waived by plaintiff's reply. (*Wines v. Stephens,* 1 Utah 308; *Henderson v. Turngren,* 9 Utah 438.)

"It may be stated as an elementary principle that neither is the promise to do nor the actual doing of that which the promise is bound by law to do, a sufficient consideration to support a contract in his favor." (6 Am. and Eng. Ency. of Law, 750 and 752; *Conover v. Stilwell,* 34 N. J. Law 58; *Haven Press Drill Co. v. Ashhurst,* 148 Ill. 115; *McCarty v. Hampton Bldg. Assn.,* 64 Iowa 287; *Lewis v. McReary,* 7 Wash. 294; *Reynolds v. Nugent,* 25 Ind. 328; *Bart-*

*lett v. Wyman,* 14 Johns. [N. Y. 260]; *Harris v. Watson,* 1 Pealn [N. P. Ed. 1795.] 72; *Harris v. Carter,* 3 E. C. & Bl. 559, 77 E. C. L.; *Silk v. Myrich,* 2 Camph. 371; *Duncle v. Duncle,* 56 Hun [N. Y.] 25; *Cross v. Morgan,* 6 Fed. 241; *India Rubber Co. v. Phelps,* 8 Blackford [U. S.].)

The verbal contract which defendant's witness testified to and upon which he relies in his defense was; that Woodman would surrender defendant's note to him for $2,500 if defendant would pay the $20,000 note and the condemnation bonds. The consideration to move from Bamberger was the payment of the note and bonds by him and the consideration moving from Woodman was the surrender of Bamberger's note to him. The sale and delivery of the property of the Great Salt Lake & Hot Springs Railway Company by the receiver to the Salt Lake & Ogden Railway Company was the consideration for the payment by that company of the $70,-000 to the receiver. The first contract was between Woodman and Bamberger and the second contract was between the receiver in pursuance of the decree and by authority of the court and the Salt Lake & Ogden Railway Company. In the first contract the payment of the note and bonds was to be the consideration for the surrender of Bamberger's note to him. In the second contract the payment of $70,000 was the consideration for the transfer of the property of the Great Salt Lake & Hot Springs Railway Company to the corporation that paid the money. In both transactions the consideration that passed from and to each party was described and identified. "Nothing is consideration that is not regarded as su 1 by both parties." (Hammond on Contracts, p. 635; *Philpot v. Gramiger,* 14 Wall [U. S.] 570.)

The defendant c· ·cedes and his witness testifies that the contract upon which the defendant bases his defense was executory and he also concedes that he has not executed the contract himself, bu claims that inasmuch as the receiver paid the foreclosure decree and the Salt Lake & Ogden Railway Company paid ic verdicts and costs in the condemnation cases, that those payments should be regarded by the court as a considerat· n moving from him to Woodman for

the promise to surrender the $2,500 note. Such payments
as we have shown cannot be so considered and therefore we
insist the contract has not been executed by either party and
there is no consideration for the cancellation of the note.
(*Billings v. Everett*, 52 Cal. 661 and 663. *W. Arthur &
Co. v. Blackman*, 63 Fed. 537; 6 Am. and Eng. Ency. Law,
689; Chitty on Contracts, p. 63.)

## RESPONDENT'S POINTS.

Our answer in effect admits the execution of the note,
pleads that it is satisfied, and states the way it was satisfied.
We can see no inconsistency in this. For what are inconsist-
ent defenses see (*Bell v. Brown*, 22 Cal. 671.) But admit
for argument that the defenses are inconsistent. It is held
in California and New York, the states from which we in-
herit our Code, that inconsistent defenses may be pleaded
in the same answer. (*Bell v. Brown*, 22 Cal. 671; *Buhne v.
Corbett*, 43 Cal. 269; *Eppinger v. Kendrick*, 114 Cal. 620;
*Societa Italiana v. Sulzer*, 138 N. Y. 472; 1 Encyclopedia
Pleading and Practice, 855, note 1.)

"Assuming that the defenses are utterly inconsistent, the
rule is established by an overwhelming weight of judicial
authority, that, unless expressly prohibited by the statute,
they may still be united in one answer. It follows that the
defendant cannot be compelled to elect between such defenses,
nor can evidence in favor of either be excluded at the trial
on the ground of the inconsistency." (Pomeroy's Code Rem-
edies [3 Ed.], sec. 722, and cases cited.) In those states
where inconsistent defenses are not allowed in the same an-
swer, the plaintiff's remedy is by motion to compel the defen-
dant to elect between his defenses instead of by demurer, as
plaintiff attempted in this case. (1 Encyclopedia Pleading
and Practice, 860. Our Code does not authorize a demurrer
to an answer because it contains inconsistent defenses. (Rev.
Stat. 1898, sec. 2976.)

Duplicity, in the sense of separately pleading two or more
defenses to the same cause of action, is permitted by the stat-

ute." (*Conway v. Wharton*, 13 Minn. 160.) We invite the court's attention to the following instructive cases on the subject of inconsistent defenses. These cases have been collected from 🖐 Century Digest, 1370-5; *Hall v. Austin,* Fed. Cas. No. 5925; *Hummel v. Moore,* 25 Fed. 380; *Billings v. Drew,* 52 Cal. 565; *Eppinger v. Kendrick,* 44 Pac. 234; *People v. Lothrop,* 3 Colo. 428; *Tucker v. Edwards,* 7 Colo. 209; *Duffield v. Denver Ry.,* 5 Colo. App. 25, 36 Pac. 622; *Gordon v. Pierce,* 11 Me. 213; *Conway v. Wharton,* 13 Minn. 158; *True v. Hunton,* 54 N. H. 121; *Mott v. Burnett,* 2 Ed. Smith 50; *Ross v. Duffy,* 12 N. Y. St. Rep. 584; *Citizen's Bank v. Closson,* 29 Ohio St. 78; *Steffins v. Lordner,* 2 S. D. 127; *Welden v. Texas Conlinental Meat Co.,* 65 Tex. 487; *St. Louis Ry. v. Whitney,* 77 Tex. 126, 13 S. W. 853; *Cronk v. Cole,* 10 Ind. 485; *Quigley v. Merritt,* 11 Iowa 147; *McCormick v. Kaye,* 41 Mo. App. 263.

The plaintiff claims that the court erred in permitting defendant to file its amended answer. The subject of amendments is left entirely to the discretion of the trial judge by our Code. (Rev. Stat. 1898, sec. 3005.) The court permitted the amended answer to be filed on terms, that is, it required us pray the costs of the plaintiff up to the time of filing the amended answer. It was hardly an abuse of discretion in view of the fact that the court found upon the trial that all the allegations of our amended answer were true. Section 3008 of our Code is important here. Certainly our bona fides cannot be questioned. Another thing, the courts of review often reverse a case when the trial court refuses an amendment, but reversals for allowing amendments under the code practice are few and far between.

STATEMENT OF FACTS:

Plaintiff, as administrator of the estate of James F. Woodman, deceased, brought this action to recover from defendant the sum of $2,504.17 and interest thereon, alleged to be due and unpaid on a certain promissory note bearing date of June 30, 1896, and payable ninty days thereafter, and which was executed and delivered by defendant to said James F.

Woodman in Salt Lake City, Utah. The complaint is in the usual form, and contains the allegations necessary to recovery on a contract of this character. On January 24, 1903, defendant filed his answer, duly verified by his counsel, in which it was denied that on June 30, 1896, or ever, he executed and delivered to James F. Woodman (payee) his promissory note as set up in the complaint. As a further and separate answer, the defendant among other things, alleged that on or about the 30th day of June, 1896, said Woodman and the defendant were engaged in numerous joint business transactions, and had numerous business dealings; that among such transactions and dealings the defendant gave to said Woodman a certain promissory note—the same set out in said complaint; that said note was not intended by either of the parties as an absolute, unconditional promise to pay, but was given and received as an undertaking on the part of the defendant for the faithful performance of a certain other business transaction then pending between said Woodman and defendant. Then follows an allegation of the performance of such other business transation on the part of the defendant, and that said note should have been canceled and surrendered. On May 9, 1903, a demurrer was sustained to the affirmative part of said answer. On February 19, 1904, the case was called for trial, and defendant was permitted to file an amended answer, duly verified by him, in which it was admitted that he executed and delivered the note sued on, but denied that it was still due and unpaid; and, further answering, defendant alleged that said note and interest was paid long prior to July 19, 1902 (date when letters of administration were issued to plaintiff herein). Another defense interposed and pleaded by defendant was that he and Woodman were on certain bonds in sum of $10,-000 given by a certain railroad corporation known as the Great Salt Lake & Hot Springs Railroad Company in certain condemnation proceedings commenced by said corporation in the Third Judicial District court March 15, 1895; also that they, the said defendant and said Woodman, were guarantors on a certain promissory note given by said rail-

road company to the National Bank of the Republic on December 26, 1894, for $20,000, payable January 1, 1896, with interest at eight per cent, per annum from January 1, 1895; that said Woodman and defendant made and entered into an agreement whereby said Woodman agreed to cancel and deliver to said Bamberger the note sued on in plaintiff's complaint if said Bamberger would hold Woodman free from any and all liability by reason of having signed said note to the National Bank of the Republic and said condemnation bonds and woul  pay or cause to be paid any judgment upon said note and sa  l condemnation bonds; that said defendant caused said not,  to the National Bank of the Rublic to be paid on or about the 22d day of September, 1897, by the corporation known as the Salt Lake & Ogden Railroad Company, which defendant, Bamberger, caused to be organized for the purpose of acquiring title to the property then owned by said Great Salt Lake &.Hot Springs Railway Company, and thereafter, and on or about the 4th day of Dec., 1897, said Bamberger caused each and all of said condemnation bonds to be paid and satisfied in full by said Salt Lake & Ogden Railway Company.  It was further alleged in the answer that Woodman refused to cancel and surrender the note sued on, although demanded so to do by Bamberger.  The trial court, among other things, found in its eighth finding of fact that the alleged agreement between Bamberger and Woodman, wherein Woodman agreed to cancel and deliver to defendant Bamberger the note sued on provided Bamberger would pay or cause to be paid said note to the National Bank of the Republic and said condemnation bonds, was entered into as alleged in defendant's answer.  The court also found in its ninth finding of fact: "That pursuant to this agreement the defendant caused said note to the National. Bank of the Republic to be paid on or about the 22d day of September, 1897, by a corporation known as the Salt Lake & Ogden Railway Company, which said defendant, Bamberger, caused to be organized for the purpose of acquiring title to the property then owned by the said Great Salt Lake & Hot Springs Railway Company; that thereafter, to-wit, before the

4th day of December, 1897, said defendant, Bamberger, paid and caused each and all of said, condemnation bonds to be paid and satisfied in full by said Salt.Lake & Ogden Railway Company." Judgment was entered in favor of defendant. Plaintiff appeals.

McCARTY, J., after making the foreg( ig statement of the case, delivered the opinion of the court.

Appellant contends that the court erred in making its eighth and ninth findings of fact referred to in the foregoing statment of the case, and that these findings are not only unsupported by, but are against, the evidence. It appears from the record that on June 30, 1896, Woodman paid a debt of $5,000 and interest thereon, which he and Bamberger jointly owed, and accepted the note sued on for the portion of the debt he had thus paid for Bamberger. Woodman placed the note in the hands of W. C. Hall for collection, who then was a practicing attorney, but who at the time of the trial was a district judge. Judge Hall, who retained possession of the note until after Woodman's death, was called as a witness and testified, and his evidence is not contradicted, that about two months after the note became due, which was subsequent to the alleged agreement between Woodman and Bamberger, and which agreement is pleaded as a defense in defendant's answer, he (Hall) presented the note to Bamberger for payment, and told Bamberger that he would like to have him pay it, that Mr. Woodman wanted it settled up; and he, (Bamberger) said it was not convenient, but he would take care of it shortly; that he again presented the note for payment about four months later, and that Bamberger said that he was not ready to pay it; that he would rather settle it later. J. H. Woodman, another witness whose testimony is not contradicted, testified in part as follows: "I met Mr. Bamberger on the street (February, 1904), and he said, 'Harry, by the way, I would like to get that note settled that the estate has against me.' [Referring to the note in question.] And he said,'I made Judge Zane [counsel for the administrator] a proposition to settle it,' offering him either two thousand or

twenty five hundred dollars. . . . 'I wish you would talk the matter over with Judge Zane.' . . . Q. What did he say to you how much was due on the note [referring to Bamberger]? A. He said he thought that was a fair offer; that he had paid out some items that he and my uncle (J. F. Woodman), were interested in, and by deducting them he thought that would be a fair offer in settlement of the note. Q. For how much? A. Twenty-five or twenty-six hundred. He said something like that." One witness for the defendant testified that he was present in Mr. Bamberger's office about the last of October, 1896, and heard the agreement referred to made; and his testimony as to the terms of the agreement, so far as material here, is as follows: "He [Woodman] says, 'I am furthermore now on that joint note.' or 'notes'—I forget the word, whether 'note' or 'notes' was used —'to the National Bank of the Republic in the sum of $20,-000 with you. I am also on the bonds with you in these condemnation suits for the Davis county lands. If you will pay these obligations, or see them paid, I will then return you your note for $2,500 which you gave me for half of the $5,000 which I paid the Salt Lake Valley Loan & Trust Company; and, furthermore, then you can have the railroad,' and Mr. Bamberger finally said, 'Well, I will do it.'" Another witness for defendant testified that he had a conversation with Woodman in October, 1896, and that "he [Woodman] said he was jointly liable with Simon Bamberger for some notes to the National Bank of the Republic for money borrowed for the railway, and was also on some condemnation bonds for rights of way, and that he held Bamberger's note for $2,500 for some indebtedness of the railway which he had been obligated to pay to the Salt Lake Valley Loan & Trust Company, and that he was going to turn this note and all his stock in the railway over to Bamberger, if Bamberger would pay the railway indebtedness and relieve him of all liability in the matter." Other witnesses testified that Woodman had made statements to them which tended to show that such an agreement had been made.

Appellants contend that taking into consideration the evidence of the different witnesses who testified in the case, in

connection with the facts that in the first answer Bamberger denied the execution and delivery of the note in question, and also alleged therein that said note was given, but not intended by either of the parties as an absolute and unconditional promise to pay, but as an undertaking on the part of the defendant, Bamberger, for the faithful performance of certain other business transactions by him; and that about one year thereafter he verified and filed an amended answer, in which he admitted the execution and delivery of the note, but pleaded payment as hereinbefore stated—the record preponderates in favor of appellant that the alleged agreement pleaded by defendant as a defense in this case was never made and entered into between Woodman and Bamberger. But, as this is an action at law, and there is some substantial evidence to the effect that the agreement was made as alleged in the answer, under section 9, article 8, of the Constitution of this State, as has been repeatedly held by this court, we are prohibited from interfering with the findings of the trial court on this point.

While we must assume, for the purposes of this case, that the agreement was made, we are satisfied that the record shows a total failure of consideration on the part of Bamberger, for it shows conclusively that he neither paid nor caused to be paid the obligations, or any part thereof, mentioned in the alleged agreement. The record shows that the Great Salt Lake & Hot Springs Railway Company made and executed a mortgage on all of its property, both real and personal, in favor of the National Bank of the Republic to secure the payment of the note for $20,000 signed by Woodman and Bamberger, as well as another note of the same amount and bearing the same date. On January 27, 1896, the bank commenced an action to foreclose the mortgage, and made Bamberger and Woodman defendants in the action. On September 26, 1896, a decree was entered in favor of the bank, and it appearing that the Great Salt Lake & Hot Springs Railway Company had become insolvent, defendant, Bamberger, was appointed receiver, and as such receiver Bamberger took charge of all property, both real and personal, belonging to

said railway company. The decree provided that the receiver proceed to sell all the property, both real and personal, belonging to said company, and in pursuance of the decree and order of sale the property was duly advertised; and on October 28, 1896, it was sold by the receiver at public sale to the Salt Lake & Ogden Railway Company for the sum of $70,000. On October 29, 1896, the sale was approved by the court, and the receiver was ordered to pay certain obligations of the Great Salt Lake & Hot Springs Railway Company, among which was the note of $20,000 to the National Bank of the Republic, signed by Woodman and Bamberger; and it was further ordered that said Woodman and Bamberger be released from any and all obligations to plaintiff bank growing out of said indebtedness. On October 30, 1896, the receiver filed his report with the court, showing he had paid in full said indebtedness in pursuance of the order of court, and on said date an order was entered discharging the receiver. It will thus be seen that Bamberger absolutely did nothing of his own volition as a private individual by way of paying or causing to be paid the obligations referred to.

The gist of the expressed terms of the oral contract is that, in consideration of Bamberger paying or causing to be paid the bank notes and condemnation bonds. Woodman agreed to surrender and cancel the note sued on. The doing of the one thing was the consideration for the doing of the other. It is not claimed that Bamberger paid the bank notes, but that he caused them to be paid. Before it can be successfully claimed that he caused them to be paid, it must be shown that he did something which produced or effected the result of payment; otherwise the consideration moving from him failed. The evidence is wanting that he did anything which produced or effected this result. What he did in the premises was done as an officer of the court, and in the performance of a legal duty thereby commanded of him, and the performance of this duty produced and effected the result of payment, which performance and result obtained was not at all dependent upon the agreement made between him and Woodman, nor at all affected thereby. To the contrary, all

the evidence in the record showing what Bamberger did by way of organizing the new company, paying the money into its treasury for its capital stock, and with which the new company purchased the property of the old company at the receiver's sale, and of winding up the business of the old road which resulted in the payment of the bank notes and condemnation bonds, were all done prior to the making of the said oral agreement. In other words, what Bamberger did was not done by virtue or in pursuance of this oral agreement, or as and for an act of himself.

While the court found that the oral contract between Bamberger and Woodman was made about the 1st day of October, 1896, the undisputed evidence introduced by Bamberger himself shows conclusively that it was made and entered into about the last of October, 1896. On September 26, 1896, a judgment was had and entered in favor of the bank on the bank notes, and Bamberger appointed receiver of the old road. On October 28, 1896, its property was sold for $70,-000. On the 29th the sale was affirmed, and on the 30th his his report filed, showing the payment in full of said indebtedness out of said funds. It is apparent, therefore, that the oral agreement had nothing to do with the fact of Bamberger accepting the office or performing the duties of receiver, or in the handling of the assets or winding up of the business of the old company. It is claimed, however, that he paid the $70,000 into the treasury of the new company, with which it purchased the property of the old road at the receiver's sale. Thereby these bank notes (in judgment) and condemnation bonds were paid, and thereby Bamberger caused them to be paid. Assuming, as the evidence shows, Bamberger did pay the $7,000 into the treasury of the new-road, it is fair inference from the evidence that it was paid prior to the time of making the oral agreement, for the undisputed evidence shows that a check for $4,000 (Exhibit No. 13) given by him in payment of ten per cent. on the capital stock subscribed was drawn in favor of the new company March 17, 1896, and paid the following day by the bank upon which it was drawn. The transaction last mentioned occurred more than three

months before the note in question was executed and de-
livered, and more than seven months prior to the time the
oral agreement was entered into. And, further, it most con-
clusively appears that the consideration of the new road pay-
ing said sum at the receiver's sale was its purchase and re-
ceipt of the property of the old road. Hence it is apparent
that the oral contract had nothing whatever to do with these
matters, and can therefore not be claimed as consideration
for it.

True, the evidence shows also that he issued his personal
checks in payment of some of the condemnation claims, but
the evidence also shows that the funds—and it is, in effect,
so alleged in the answer—against which the checks were
drawn were funds belonging to the Salt Lake & Ogden Rail-
way Company. The record further tends to show that at
the time this agreement is alleged to have been made the note
to the National Bank of the Republic had been paid, or at
least the funds were in his hands, as receiver, with which it
was his legal duty to pay it. Therefore, as contended by ap-
pellant, no consideration whatever passed from Bamberger
to Woodman for the cancellation and surrender of the note
sued on.

> "It may be stated as an elementary principle that
> neither is the promise to do nor the actual doing of
> that which the promisee is bound by law to do a
> sufficient consideration to support a contract in his
> favor." (6 Am. and Eng. Law, 99, 750, 752; *Con-
> over v. Stillwell,* 34 N. J. Law 58; *Lewis v. Mc-
> Reary, & Wash.* 294, 34 Pac. 832; *Reynolds v. Nu-
> gent,* 25 Ind. 328; 1 Parsons on Contracts, p. 467;
> *Dunckel v. Dunckel,* 56 Hun 25, 8 N. Y. Supp.
> 888; *Pope v. Hays,* 19 Tex. 375; *Parmelee v.
> Thompson,* 45 N. Y. 58, 6 Am. Rep. 33; *Hammond*
> on Contracts, p. 662; 9 Cyc. 347.)

In the case of *Dunckel v. Dunckel,* supra, one John A.
Dunckel, who was indebted in an amount of over $11,000,
for the payment of $7,500 of which his father, William

Dunckel, was surety, died leaving a will appointing his wife executrix and sole legatee thereunder. Soon after the death William Dunckel promised the widow and executrix that if she would pay these debts on which he was liable, and would save him from paying the same, he would give her a life estate in certain land which had been occupied by plaintiff and her husband for about seventeen years, but of which William Dunckel was the owner. The widow agreed to pay these debts, for which at that time it was uncertain whether the estate of the deceased would be sufficient. She subsequently paid the debts out of the funds belonging to the estate, and delivered the notes on which William Dunckel was liable to him, and demanded the life lease of the premises which she had continued to occupy after the death of John A. Dunckel, her testator. William Dunckel refused to deliver the lease, and on being sued by the widow defended on the ground that there was no consideration for the contract, inasmuch as the debts in question had been paid out of the assets of the estate of the testator, who was primarily liable. The Supreme Court, in the course of the opinion, says:

"Finally, as an independent proposition, this plaintiff had not done anything or paid anything which gives her a claim of any sort against defendant. She could not maintain an action against defendant for any money paid, because she has paid nothing except what she was bound to pay from the moneys belonging to the estate, without regard to the agreement. He owes her nothing for services. All she has done was to discharge the duties of executrix, for which she was paid out of the estate. It was not part of the agreement that she was to act as executrix, nor did she assume that duty because of the agreement. She expected to and did accept the trust because the will of her husband so appointed. The defendant agreed with her that, if she would do her duty in the discharge of that trust, as the law itself required, he would give her the life lease.

There was therefore no legal consideration for the
agreement."

Counsel for respondent put much stress upon the fact that
Bamberger was the promoter of and owned practically all the
stock of the corporation that purchased and succeeded to all
the rights of the Great Salt Lake & Hot Springs Railway
Company. The record shows that this company was organized
March 17, 1896, more than three months before the execution
and delivery, June 30, 1896, by Bamberger to Woodman of
the note sued on, and more than seven months prior to the
time the alleged agreement was entered into, which time the
uncontradicted evidence conclusively shows was "about the
last of October, 1896;" and it is alleged in the answer, and
the court found, that the Salt Lake & Ogden Railway Com-
pany was organized to acquire title to the property owned by
the Great Salt Lake & Hot Springs Railway Company.
Therefore it is conclusively shown by the record itself that
this alleged agreement had nothing to do with the organiza-
tion of the corporation which purchased the property at the
sale referred to, and that the payment of the obligations men-
tioned was neither directly nor indirectly the outgrowth of
such agreement.

The part of the findings of the court which holds that Bam-
berger paid or caused to be paid the obligations referred to is
not only unsupported by the evidence, but is in fact contrary
to and against the same, and hence is erroneous.

The judgment is reversed, with directions to the trial court
to grant a new trial. Costs of this appeal are to be taxed
against the respondent.

STRAUP, J., concurs.

BARTCH, C. J., (dissenting.)

I am unable to concur with the majority in reversing this
case. At the trial the court, after finding that before the
making of the agreement in question certain obligations ex-
isted for the discharge of which Mr. Woodman and Mr. Bam-
berger were liable, made findings of fact as follows: "That

said railway company became insolvent and was put into the hands of a receiver on or about the 24th day of September, 1896. That on or about the 1st day of October, 1896, said James F. Woodman, deceased, and this defendant, Simon Bamberger, made and entered into an agreement wherein and whereby said Woodman agreed to cancel and deliver to this defendant, Simon Bamberger, the note sued on in plaintiff's complaint, if said Bamberger would hold said Woodman free and harmless from any and all liability by reason of having signed said note to the National Bank of the Republic and said condemnation bonds, and would pay or cause to be paid said note and said condemnation bonds. That pursuant to this agreement this defendant caused said note to the National Bank of the Republic to be paid on or about the 22d day of September, 1897, by a corporation known as the Salt Lake & Ogden Railway Company, which said defendant, Bamberger, caused to be organized for the purpose of acquiring title to the property then owned by the said Great Salt Lake & Hot Springs Railway Company; and thereafter, to-wit, before the 4th day of December, 1897, said defendant, Bamberger, paid and caused each and all of said condemnation bonds to be paid and satisfied in full by said Salt Lake & Ogden Railway Company. That after said note and condemnation bonds were satisfied as aforesaid said defendant demanded the cancellation and surrender of the note in this suit, and that said James F. Woodman accepted the cancellation of said obligations in full satisfaction of said note, and promised and agreed to surrender and deliver said note to this defendant pursuant to his said agreement hereinbefore set out with said defendant Bamberger. That the only reason that said note was not surrendered by said James F. Woodman in his lifetime to said defendant, Bamberger, was because said Woodman had mislaid said note and could not find it."

The appellant contends that the evidence is insufficient to support these findings, and my Brethren seem to sustain this contention; for, while they admit an agreement was made as claimed by the defendant, they hold that there was "a total failure of consideration." The evidence on this subject in

part is as follows: The witness Oberndorfer, after stating that he was present at a conversation when the agreement was made, said: "A conversation occurred between Mr. Bamberger and Mr. Woodman. Mr. Bamberger asked Mr. Woodman to continue with him in the railroad business. Mr. Woodman said: 'I am too old to go into any new railroad ventures. I am with you on the note to the Bank of the Republic for $20,000, and I am also on the bonds in those condemnation suits for those Davis county lands; and if you will pay those, or see that they are paid, and release me of my obligation on that note and on those condemnation bonds, I will give you back the twenty-five hundred dollar note which you gave me for your half of what I paid the Salt Lake Valley Loan & Trust Company, and you can have the railroad also. You can have it all.' Mr. Bamberger asked him to continue with him in the railroad, and he repeated, 'I am getting too old,' and he again repeated the obligations what he was on. He said that if Mr. Bamberger would pay them, or see that they were paid, he could have the railroad, and he would give back the twenty-five hundred dollar note. Mr. Bamberger then said, 'I will do it.' That was some time in October, 1896." This witness had a conversation with Mr. Woodman the next year, when he exhibited to him a voucher showing that he had just paid the last of the condemnation suits, and Mr. Woodman said, "That is good." It will be noticed that the agreement herein mentioned does not provide that Mr. Bamberger should pay the obligations personally, but he was bound to pay them personally, or cause them to be paid, so as to relieve Mr. Woodman from their payment. The evidence, however, shows that Mr. Bamberger did actually, out of his own money, pay some of the condemnation verdicts. Two of his personal checks were introduced in evidence, showing payments of $975.74 and $131.10, respectively. It is also shown that pursuant to the agreement Mr. Bamberger relieved Mr. Woodman of all the obligations referred to, amounting to about 30,000, exclusive of interest, and that he furnished all the money that was used to buy the property of the Great Salt Lake & Hot Springs Railway

Company. On this subject the defendant testified as follows:
"Q. State with whose money the obligations referred to in
the case of the National Bank of the Republic against the
Great Salt Lake & Hot Springs Railway Company were paid.
A. My money. My money paid all those obligations; all
the obligations that Woodman was indorser on. Q. With
whose money were those condemnation settlements referred
to in defendant's Exhibits 1 to 8, inclusive, paid? A. Well,
my money; that is, by the way of the railroad company. I
paid the money to the treasurer of the railroad company;
paid it into the company. Q. You paid with your money
some of the early condemnation suits, did you? A. Well,
I remember it simply by the checks as they came up this
morning. Paid the suits of the Fords and John S. White.
This check, Exhibit No. 13, for $4,000, payable to Ed.
Duncan, this is my check. Q. What was it for? A. That
was paid—the 10 per cent. on the organization of the Salt
Lake & Ogden Railway Company. Q. Who owns all the
stock of the Salt Lake & Ogden Railway Company? A. I
own it virtually all. I mean with the exception of a
few shares to qualify directors, one share apiece, Q.
How long have you owned it? A. Ever since its or-
ganization. I paid the capitalization of the company.
The stock is practically owned by me. I organized the
company." It thus appears that Mr. Bamberger's ser-
vices and money became the instruments to save Mr. Wood-
man harmless from the obligations referred to in the agree-
ment. This was acknowledged by Mr. Woodman, who ex-
pressed his pleasure and satisfaction with Mr. Bamberger's
efforts to relieve him of the obligations, as appears from the
testimony of the witness Mountney, who in part testified:
Q. Did you hear any talk between Mr. Bamberger and Mr.
Woodman? A. It was in the spring or summer of 1900.
Mr. Woodman and Mr. Bamberger came into the back of-
fice where I had my desk, and Mr. Woodman said to Mr.
Bamberger, 'I understand the railroad is doing very nicely
now?' Mr. Bamberger said, 'Yes, it is doing very well in-
deed.' Mr. Woodman said: 'I am sorry I am old, or else

I should like to have gone in with you on it. I wish you success.' Mr. Bamberger said, 'How about that note I gave you for taking up the Salt Lake Valley notes?' Mr. Woodman said, 'Why, I will send it down.' Mr. Bamberger said, 'I will send my stenographer up for it.' That was practically all he said." The stenographer referred to, upon the same subject testified: "Q. What is your occupation? A. Stenographer for Mr. Bamberger. Have been his stenographer for seven years. Was in the office at the time of the conversation between Mr. Bamberger and Mr. Woodman. It was about 1900. As Mr. Woodman was leaving, Mr. Bamberger asked, 'What about that note I gave you—the Salt Lake Valley note?' Mr. Woodman said, 'Oh, yes; I will look for it, and send it down.' Mr. Bamberger said, 'No, I will send my stenographer for it.' That is all I heard. Q. Did you go up? A. I did, and he said, 'Call again.' Q. Did you call again? A. I did. Q. What did he say then? A. Well, he said: 'Why does he bother me about that? I will send it down when I find it.'" The witness Knox testified: "I know Mr. Bamberger and Mr. Woodman were indorsers on the note at my bank. The note was for $20,000. Had several conversations with Mr. Woodman about it. We were endeavoring to have these notes paid. There was another one of $20,000 also. Mr. Woodman was the indorser on one. Q. Did you state there was another note for $20,-000? A. Yes, Mr. Woodman was only on one. Mr. Bamberger agreed to pay it. Mr. Woodman came to the bank, and wanted to know if these matters were settled; and the note was finally taken by Mr. Bamberger, as agreed between him and Mr. Woodman. Mr. Woodman was there at the bank, and stated they had made the adjustment whereby Mr. Bamberger assumed the payment, and wanted to know if it would be all right if they settled it that way. There was a note that he had taken up of the Salt Lake Valley Loan & Trust Company, and some bonds, that were to be all surrendered when Mr. Bamberger finally paid this note. That was about the talk, as I remember it. Afterwards he asked me if everything had been settled up and satisfied, and if we had

gotten our pay. I told him we had. He said Mr. Bamberger had been fair in the matter, after all, and had paid him in full, everything as he had agreed to. It was merely a conversation that was had some time afterwards. That was the remark that was made, that everything had been settled satisfactorily, and he was very glad we had gotten our money, etc. Mr. Bamberger had paid him everything he owed him. He said, 'He don't owe me anything.' " "State more fully, Mr. Knox, what was said by Mr. Woodman, if anything, about the obligation that Mr. Bamberger was on with him ? A. He came there, and wanted to know whether everything was settled or not. He said he was to surrender this obligation—this Salt Lake Valley Loan & Trust Company note, and I think some other matter—but he did not want to do it unless everything was done as agreed, and I told him it was done; and I understand him that he was going to surrender this note, and he came to see if everything had finally been adjusted between us." The witness McCartney testified: "I had a conversation with James F. Woodman. To the best of my recollection it was in October, 1896, shortly after the receivership was appointed for the Great Salt Lake & Hot Springs Railway Company. Early in 1896 the company got into financial difficulties, and shortly after the appointment of a receiver in September, 1896, I had a conversation with James F. Woodman about the railway. To the best of my recollection it was in October, 1896. He said he considered the stock in that railway a total loss, and was not going to have anything to do with reorganizing the company. He said he was jointly liable with Simon Bamberger for some notes to the National Bank of the Requblic for money borrowed for the railway, and was also on some condemnation bonds for rights of way, and that he held Bamberger's note for $2,500 for some indebtness of the railway which he had been obliged to pay to the Salt Lake Valley Loan & Trust Company, and that he was going to turn this note and all his stock in the railway over to Bamberger if Bamberger would pay up the railway indebtedness, and relieve him of all liability in the matter."

There is other evidence in the record of similar import, but I do not deem further reference thereto important. It seems manifest that there was not only an agreement between the parties, based upon sufficient consideration, but that the same was faithfully performed by the defendant, and that he was entitled to a surrender of the note sued upon. Under such evidence, as is disclosed by the record, it is difficult to see how the findings of the court can be disturbed. In my judgment, this is clearly a case where the rule, so frequently announced by this court, that, where there is a substantial conflict in the evidence the findings of the trial court will not be disturbed, should be applied.

I therefore dissent.